# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **EDDIE L. HARRIS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 3185 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **JO ANNE B. BARNHART,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 405(g),[1] Plaintiff, Eddie L. Harris, seeks judicial review of the

final decision of the Commissioner of the Social Security Administration ("Commissioner"), who

determined that Harris was not entitled to Disability Insurance Benefits.[2] Harris seeks a reversal

or remand of the denial of his claim. He claims that the administrative law judge's ("ALJ")

decision was not based upon substantial evidence and that the ALJ committed legal error by

failing to perform a proper credibility determination, failing to consider evidence of a mental

impairment, incorrectly concluding that Harris could do light work, and failing to consider all

relevant evidence. Additionally, Harris claims that the Commissioner's Appeals Council failed to

---

[1] "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . ." 42 U.S.C. § 405(g).

[2] Disability Insurance Benefits provide a minimum level of benefits to persons under age sixty-five who: 1) have a disability as defined by 20 C.F.R. § 404.1505; and 2) qualify as fully insured by having sufficient Social Security earnings as provided in 20 C.F.R. § 404.130.

consider new medical evidence. The Commissioner denies these claims. Both parties have consented to have this Court conduct any and all proceedings in this case, including entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). For the reasons that follow, this Court reverses the Commissioner's final decision and remands this case for further proceedings.

## I. Procedural History

On March 2, 2000, Harris filed an application for Disability Insurance Benefits alleging disability since August 11, 1999. (R. at 15, 52A.) After the application was denied on April 18, 2000, and again on reconsideration on April 28, 2000, Harris requested a hearing before an ALJ. (R. at 31.) The ALJ's hearing was conducted on February 8, 2001, before ALJ William J. Wilkin in Gary, Indiana. (R. at 14.) Harris was represented at the hearing by attorney James Balanoff. (Id.) On March 28, 2001, the ALJ found Harris not disabled by reason of his ability to perform a significant number of jobs that exist in the national economy. (R. at 20.) This decision became the final decision of the Commissioner on March 14, 2003, when the Appeals Council denied Harris's request for review. (R. at 5-6.) Harris now seeks a review of that decision and remand pursuant to sentence four and sentence six of 42 U.S.C. § 405(g).

## II. Background Facts

### A. Medical Evidence Submitted to the ALJ

Eddie L. Harris was born January 6, 1956, and was forty-five years old at the time of the ALJ's decision. (R. at 52A.) He is a high school graduate who served in the military for

twenty-one years and retired on October 31, 1998. (R. at 84.) After he left the service, he worked for the U.S. Postal Service as a window clerk until the date of his alleged disability. (Id.)

Harris has received extensive medical attention over the last several years. Harris was initially treated at North Chicago VA Hospital on January 12, 1999, for complaints of pain in the left ankle following surgery and trauma in 1995 and tinnitus in the left ear. (R. at 117.) The doctor also noted a previous history of sarcoidosis. (Id.) Harris returned to the hospital November 29, 1999, complaining of an "on and off" inability to hear out of his left ear. (R. at 121.)

Harris returned two months later in February 2000 complaining of pain in his knees and feet. (R. at 112-13.) Dr. Amar Jyothi Peruri, M.D., referred him to a podiatrist and orthopedist. (Id.) On March 15, 2000, a podiatrist examined Harris. (R. at 133.) The podiatrist diagnosed degenerative joint disease of the left ankle and ruled out plantar fasciitis. (Id.) On April 11, 2000, an orthopedist examined Harris for his knee problems. (R. at 132.) The doctor noted Harris's history of trauma and fracture, but found no definite arthritis and concluded that his lower left extremity was stable and that he could ambulate with no external aid. (Id.)

Harris returned to the VA Hospital in February 2000 complaining of tinnitus and chronic sinus problems. (R. at 114.) He was referred to an audiologist to whom he complained of constant pressure build up in his left ear, fluctuating hearing in his left ear, and constant tinnitus. (R. at 124, 133.) An audiological examination revealed that his bilateral hearing sensitivity was within normal limits, except for high frequencies at 6 kHz and 8 kHz in his left ear. (Id.) A week later Harris underwent auditory brainstem response testing, which did not suggest any dysfunction. (R. at 134.)

- 3 -

On March 22, 2000, Harris returned to the VA Hospital and had x-rays taken of his ankles. The x-rays indicated a previous fracture in his left ankle. (R. at 143.) On June 15, 2000, Harris again returned to the hospital with complaints of mild ache and soreness in the left knee. (R. at 182.) The doctor diagnosed Harris with an old trauma of his left knee and a history of a tear of his left anterior cruciate ligament. (Id.) Dr. Homer C. Groves, M.D., recommended that Harris begin physical therapy for his left knee and ordered an x-ray of the knee. (R. at 168.)

On April 9, 2000, Dr. Stanley Rabinowitz, M.D., examined Harris for purposes of his disability claim at the request of the State of Illinois Disability Determination Services. (R. at 147.) Dr. Rabinowitz noted Harris's history of sarcoidosis since 1983 and his complaints of intermittent fevers, tinnitus, and sinusitis. (Id.) Dr. Rabinowitz noted that Harris currently takes Motrin or Naproxen for joint pain. (Id.) Additionally, Harris complained of significant pain in the left ankle, both knees, and the left elbow, and chronic lower back and cervical spine pain. (Id.) Dr. Rabinowitz reported a history of multiple surgical procedures on the left ankle. (R. at 149.) Harris informed Dr. Rabinowitz that his neck pain radiates down the left side of his body and that it "feels 100% dead." (R. at 147.) Harris reported difficulty walking or standing for more than ten to fifteen minutes, bending repetitively, pushing or pulling, or lifting more than thirty pounds. (R. at 148.) He also stated that he could sit without difficulty and was able to perform the usual activities of daily living. (Id.)

On examination, Dr. Rabinowitz found that Harris's vision was 20/20 and that he had mildly decreased breath sounds and dullness to percussion. (Id.) Harris's left ankle showed no signs of nonunion or osteomyelitis, but had significant limitation of range of motion with pain. (R. at 149.) The examination showed no other limitation of motion and that straight leg raising

- 4 -

was negative. Harris was able to ambulate with a normal gait about the examining room without the use of an assistive device. (Id.) Dr. Rabinowitz found that his grip strength and digital dexterity were preserved and that his neurological exam was normal. (Id.) Dr. Rabinowitz's impressions were a history of pulmonary sarcoidosis with exertional dyspnea, chronic sinusitis, history of tinnitus, status post fracture of the left ankle with multiple surgical reparative procedures, status post right foot ganglion cyst removal, and degenerative joint disease. (R. at 150.)

In April 2000, two non-examining state agency physicians reviewed the record and completed a residual functional capacity ("RFC") determination on behalf of Disability Determination Services. (R. at 153-160.) Dr. Boyd McCracken, M.D., and Dr. E. C. Bone, M.D., found that Harris could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand about six hours in an eight hour workday, and sit about six hours in an eight hour workday. (R. at 154.) They found that his ability to push and pull with his lower extremities would be limited in his left ankle. (Id.) They found that Harris should only occasionally climb ramps and stairs and should never climb ladders, ropes, or scaffolds. (R. at 155.) They also indicated that he should avoid even moderate exposure to fumes, odors, dusts, gasses, and poor ventilation due to his history of sarcoidosis. (R. at 157.) The doctors also reported a decreased range of motion in his left ankle with pain, but that he had no problem squatting and his gait and station were normal. (R. at 160.)

On April 19, 2000, a pulmonary specialist, Dr. Istanbouly, examined Harris for complaints of fever. (R. at 131.) The doctor noted Harris's history of sarcoidosis and sinusitis. Dr. Istanbouly diagnosed Harris with chronic nasal congestion and tenderness of the left

maxillary and frontal sinuses. (Id.) The doctor prescribed an antibiotic and ordered further testing. (Id.) That same day Harris underwent pulmonary testing which revealed no evidence of acute pulmonary infiltration. (R. at 142.)

On May 8, 2000, Harris went to the VA Hospital to have his sinuses treated. He was diagnosed with chronic right ethomoidal sinusitis with thickening of the turbinate in the right nasal cavity. (R. at 141.) That same day, Harris saw Dr. Heather McCombs, D.P.M., a podiatrist, for pain in both heals and ankles, difficulty with his arches, and for a burning sensation and inability to curl his toes. (R. at 130, 185.) Harris was instructed to consult neurology and to return to podiatry in two months. (Id.)

On May 15, 2000, Harris went to a pulmonary clinic, where he complained of an occasional cough and low grade fever. (R. at 185.) The doctor indicated that the pulmonary function tests were normal and that there was no evidence of active diseases. (Id.)

On June 16, 2000, Harris once again returned to the clinic complaining of knee and neck pain. (R. at 166.) Harris underwent X-rays which showed no fracture of the knees or neck and a slight narrowing of the intervertebral disc space between the C5 and C6 vertebrae in the neck. (Id.)

On September 18, 2000, Harris again went to the pulmonary clinic, this time complaining of off and on high grade fevers and night sweats. (R. at 180.) The doctors recommended getting tested for tuberculosis and active sarcoidosis. (Id.)

Once again, on October 18, 2000, Harris ended up back at his primary care clinic, complaining of constant headaches since 1995 which he graded a ten out of ten. (R. at 177.) He also complained of ankle and back pain, poor sleeping, feeling like his brain was "dead," and eye

problems, although he admitted he read and watched television without a problem and his vision was 20/20. (Id.) On exam, Dr. Xiao Li, M.D., reported that Harris showed no edema and his left foot and ankle showed decreased sensation, range of motion, and strength. (Id.) The doctor noted that Harris's headaches may be secondary to his sinusitis and recommended that he finish his prescribed antibiotics. (Id.) Dr. Li also prescribed pain control medicine and noted that Harris was recommended for physical therapy, but did not go. (Id.) Notably, Dr. Li questioned whether Harris might be suffering from depression, as there appeared to be some symptom exaggeration. (Id.) The doctor noted that he was considering a neuropsychiatry evaluation. (Id.)

Just before his hearing with the ALJ, Harris again went to the VA Hospital. This time he complained of chronic diffuse musculoskeletal head and facial pain, neck, lower back and left knee pain. (R. at 210.) The examining physician, Dr. Brian Lipson, M.D., reported that it was difficult to stay with Harris during conversation and suspected an aspect of symptom magnification or somaticization. (Id.) Dr. Lipson spoke with Dr. Darcy Mouton and they agreed to submit Harris to personality testing, as the problems were believed to be resultant from conversion hysteria. (Id.)

On January 29, 2001, Dr. Mouton, director of the neuropsychology lab, administered the MMPI 2, TAT, and Rotter Incomplete Sentences Blank tests. (Id.) Dr Mouton noted that much of Harris's self-report was "odd or unusual" and called into question the possibility of conversion symptoms or delusional material. (R. at 210-11.) The doctor also noted that Harris was unable to continue in his position at the U.S. Post Office due to deficits in his concentration, i.e., being "in a daze" or having a "cloudy feeling." (R. at 211.) The doctor noted that Harris acknowledged experiencing rather "unusual thoughts" and that Harris indicated that doctors had tried to help

- 7 -

him with this. (Id.) Harris also admitted to hearing voices and that he had been taught by doctors to use various non-medication treating techniques to control this problem. (Id.) Harris generated an invalid profile from the personality tests, however, Dr. Mouton noted that while his MMPI 2 profile was invalid for clinical purposes, the configuration of his clinical scales was consistent with those observed in both conversion and schizophrenic disorders. (Id.) Results of the TAT showed that Harris might often feel that he is the victim of his environment or that environmental forces conspire against him. (Id.) Dr. Mouton also noted that Harris's projective sentence completions suggest concerns for his own mental well-being and a tendency toward self-isolative behavior. (Id.) Dr. Mouton concluded that Harris might be suffering from psychotic symptoms, including auditory hallucinations. (Id.) The doctor also felt that Harris was construing mental problems as physical, as Harris felt that physical problems were more socially acceptable than mental problems. (R. at 212.)

## B. Medical Evidence Submitted to the Appeals Council

At the request of his treating physicians, on February 9, 2001, Harris underwent a psychological examination performed by Dr. Piro Rjepaj, M.D. (R. at 221-24.) Dr. Rjepaj noted that Harris was somewhat guarded, shy, and withdrawn, and that he was overconcerned with questions relating to his general health. (R. at 222.) The doctor's diagnosis ruled out a cognitive impairment and somatisation disorder. (R. at 223.) A brain MRI detected no abnormalities. (R. at 223, 228.)

On May 2, 2001, Harris saw Dr. Peter Newsom, M.D., a psychiatrist in a mental health clinic. (R. at 219.) Harris reported that his mood was good and that he was sleeping and dating

without a problem. (Id.) He also reported that his chronic tinnitus made it hard for him to concentrate at times, although this problem was not any worse than it was in the past. (Id.) The psychiatrist assessed chronic problems with concentration, possibly due to vision and tinnitus problems. (Id.) The doctor doubted that the problems had a psychiatric etiology. (Id.)

On July 23, 2001, Harris again returned to the primary care clinic and saw Dr. Lipson for complaints of pain and sinusitis. (R. at 216.) Dr. Lipson noted that the neuropsychology testing resulted in no psychiatric diagnosis and that it was possible that his impaired vision and tinnitus contributed to his performance on the personality tests. (Id.)

On July 29, 2001, Harris went for an audiologic consultation for his tinnitus and complaints of fluctuating hearing. He was diagnosed with unilateral, high frequency sensorienrual hearing loss in his left ear without loss in his right ear. (Id.) The doctor found that he would have little hearing loss for most normal activities. (Id.)

In March 2002, Harris once again returned to the VA Hospital with complaints of vomiting accompanied by blood and burning pain in his stomach. (R. at 230.) He was referred to gastroenthrology for evaluation and prescribed rapebrazole for his stomach pains. (R. at 230-31.)

Next, on May 13, 2002, Harris had a bone density scan done on his hip. (R. at 251.) The doctor noted that he has severe osteoporosis in the hip. (Id.)

On July 25, 2002, Harris returned to the VA Hospital with more complaints of headaches. (R. at 237.) He stated that these headaches had become more severe over the last month and would not go away. The doctor also noted that Harris's eyelid was twitching and that he had trouble focusing. (Id.)

On October 24, 2002, Dr. Melissa Chudnow-Yopps, M.D., examined Harris. (R. at 250.) The doctor noted swollen feet, shortness of breath, and heartburn. Dr. Chudnow-Yopps's assessment was acute sinusitis, GERD, and sarcoidosis. (Id.)

Finally, on November 7, 2002, Harris underwent a consultation examination. Dr. John Skosey, M.D., noted that the DEXA revealed osteoporosis of the hips. (R. at 248.) The diagnosis was osteoporosis and hyperparathyroidism. (Id.) On December 6, 2002, Harris had a follow-up for his osteoporosis where the doctor advised that he continue taking calcium. (R. at 245.)

### C.    Hearing Testimony

On February 8, 2001, Harris testified at his hearing before ALJ William J. Wilkin. (R. at 14.) He testified that he is a high school graduate who served in the military as a scout and recruiter for approximately twenty-one years. (R. at 300.) Limitations in standing, walking, sitting, and hearing prevented him from continuing his military career. (R. at 304.) He was shortly thereafter employed by the Post Office, working as a mail clerk and a mail handler clerk from February 1999 to August 1999. (Id.) The job involved heavy lifting and standing on his feet all day. (R. at 306.) Harris said that he left that job due to back spasms, swelling of his feet, dizziness, and fainting spells. (R. at 307.) However, he later indicated that the Post Office let him go because the Army would not certify his mental status. (R. at 351.)

Harris testified that he continues to have problems with swelling in his feet, with the left foot worse than the right. (R. at 307-08.) He indicated that this causes pain when he walks. (R. at 309.) He indicated that he has pain in his knees when bending down which lasts for thirty

- 10 -

to forty minutes. (Id.) Harris testified that he could stand for around ten minutes before he gets light-headed and that he is light-headed most of the day. (R. at 323-24.) If Harris bends over too far, it feels like a "ton of bricks" hits his head and he passes out. (R. at 324-25.)

Harris testified to pain in his neck that radiates down to his collarbone. (R. at 310-11.) Harris also indicated that he has problems with his left ear, which interferes with his balance. (R. at 311.)

Harris stated that he only really leaves the house to go to the doctor or to visit his cousins every once in a while. (R. at 318, 320.) He explained that he does not do yard work, grocery shopping, have any hobbies, or participate in any sports. (Id.) He stated that the furthest that he walks is about one block, maybe more. (R. at 320.)

Harris testified that while working at the Post Office he was able to lift twenty-five pounds, but this caused problems with his wrist. (R. at 325.) He also indicated that he has problems with his left hand and tries to avoid using his left hand when performing heavy lifting. (R. at 321-22.)

Harris also testified that he began to have problems remembering his own name in 1988, and that this was the beginning of his memory and concentration problems. (R. at 331-32.) He also indicated that he had difficulty communicating with co-workers at the Post Office. (R. at 331.) He testified that he recently underwent psychological testing to address these issues. (R. at 328, 335.)

The ALJ posed several hypotheticals to Michelle Peters, a vocational expert ("VE"), to determine the type and number of jobs suitable for someone with various restrictions. In the first hypothetical, the ALJ asked the VE what types of jobs are available for someone who could

- 11 -

perform "medium work," as classified in the regulations, with the restrictions of having to work in a clean atmosphere, no climbing or working at heights, and only performing simple one or two steps tasks that require low degrees of concentration. (R. at 347.) The VE responded that someone with those restrictions could work as a grocery store bagger, and there are 6,800 such positions in the national economy. (Id.)

The ALJ then asked the VE what jobs are available assuming the same restrictions but performing "light work" as defined in the regulations. (Id.) The VE responded that he could work as a hand packager (2,050 positions) or an office cleaner (3,400 positions). (R. at 348.)

Next, the ALJ asked about someone who could perform "sedentary work" with the same restrictions. The VE responded that he could work as a hand packager (500 positions) or in a limited number of assembly positions (1000 positions). (Id.) The ALJ then asked about the same work level with the additional restrictions of standing or walking only ten or fifteen minutes at a time, no repeatable bending, and lifting no more than thirty pounds. (R. at 349.) The VE responded that the job market would be the same. (Id.) The VE then testified that not being able to work eight hours a day would preclude employment. (Id.)

Finally, in response to the hearing testimony, the ALJ indicated that he "may get a mental status examination" for Harris because of problems raised during the hearing. (R. at 350.) He said that he would like to get a report with a neuropsychological effect before he makes a judgment and left the record open until March 10, 2001, for supplemental evidence. (Id.) The ALJ also suggested that a supplemental hearing could be held if necessary. (R. at 349.)

## D.    The ALJ's Decision

After considering the evidence and testimony above, the ALJ found that Harris is not disabled within the meaning of the Social Security Act. (R. at 14-20.)  The ALJ performed a five step evaluation pursuant to 20 C.F.R. § 404.1520.  He noted that Harris has not engaged in substantial gainful activity since the onset of disability and meets the non-disability requirements set forth in Section 216(i) of the Social Security Act. (R. at 15.)  He found that while Harris's impairments are severe, they do not meet or medically equal one of the impairments listed in the regulations. (R. at 16.)

The ALJ then determined that Harris retained the RFC to perform a limited range of light work, as defined by 20 C.F.R. § 404.1567, provided that he work in a clean atmosphere, not climb ladders, ramps, or scaffolds, and limit his work to simple one or two steps tasks which do not require more than low degrees of concentration. (R. at 17.)  In making this determination, the ALJ's report indicates that he considered the medical evidence relating to Harris's history of sarcoidosis, ankle and back pain, and respiratory problems. (R. at 16-17.)

The ALJ concluded that Harris's "allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision." (R. at 19.)  He indicated that he found Harris to be "a very poor witness, who did not answer direct questions." (R. at 17.)  The ALJ noted that this is consistent with Harris's performance on the MMPI 2 and TAT tests. (Id.)  The ALJ also reported that Harris testified that he could stand ten minutes, walk one block, and carry twenty-five pounds. (Id.)  The ALJ found that the medical evidence indicated a "limited range of motion in the left ankle, which would affect his ability to stand/walk for prolonged periods of time," but that he also has full motor strength in the lower extremities and has no

- 13 -

impairment in his gait or station. (Id.) Based on this evidence, and Harris's statements made to his doctors, the ALJ found that Harris could not meet the standing or walking requirements of a full range of light work and that he could lift up to thirty pounds. (Id.)

Based on this RFC, the ALJ found that Harris could not perform any of his past work, as it requires a medium level of physical exertion. (R. at 18.) Therefore, the ALJ referred to the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations to determine if there are other jobs existing in substantial numbers in the national economy that Harris could perform. (Id.) The ALJ considered Harris's age, education, past work experience, and RFC in making his determination. As indicated, the ALJ classified Harris's RFC as able to perform a significant range of light work, as defined by 20 C.F.R. § 404.1567, with limitations. (Id.)

At this point, the ALJ then determined that there were a significant number of jobs in the national economy that Harris could perform given his RFC and other vocational factors. (R. at 19.) The ALJ relied on a VE's testimony that Harris is capable of making a vocational adjustment to other work. (Id.) The ALJ adopted the VE's opinion that, given Harris's RFC and limitations, Harris could work as a hand packager or office cleaner, both of which had job openings in significant numbers in the national economy. (Id.) Therefore, the ALJ found Harris "not disabled" within the framework of the Social Security Act and the relevant regulations. (R. at 19-20.)

### III. Discussion

Social Security regulations require that a claimant suffer from a disability within the meaning of the Social Security Act in order to receive Disability Insurance Benefits. 20 C.F.R.

§ 404.1505(a). In order to determine whether the claimant is disabled, a sequential five-step evaluation must be performed pursuant to 20 C.F.R. § 404.1520. The five steps are:

> Step 1: Is the claimant presently employed and doing substantial gainful activity? If yes, the claimant is not disabled.
>
> Step 2: Is the claimant's impairment severe and expected to last at least twelve months? If no, the claimant is not disabled.
>
> Step 3: Does the impairment meet or exceed one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1? If yes, the claimant is disabled.
>
> Step 4: Is the claimant able to perform his past work experience? If yes, the claimant is not disabled.
>
> Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy? If yes, the claimant is not disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(v). *See also Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994). The ALJ performed this five-step process and determined that Harris was not disabled at step five. As noted above, the ALJ determined that Harris's RFC allows him to perform a significant range of light work, with a few limitations, and that a significant number of suitable jobs exist in the national economy.

Section 405(g) of the Social Security Act authorizes judicial review of final decisions of the Commissioner with the power to affirm, modify, or reverse, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). The scope of review is limited to determining whether the Commissioner's decision is supported by substantial evidence or whether the Commissioner committed an error of law. *Dixon v. Massanari*, 270 F.3d 1171, 1176

(7th Cir. 2001). Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citing *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997)). A reviewing federal court may not substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). Nonetheless, this Court should not act as an "uncritical rubber stamp." *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986). Rather, we examine both the evidence favoring a finding of disability as well as evidence favoring the claimant and consider whatever in the record "fairly detracts" from the weight given to each. *Id.*

The ALJ's decision must allow for a meaningful review. *Herron*, 19 F.3d at 333. The ALJ's decision must demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). If the ALJ fails to build an "accurate and logical bridge between the evidence and the result," the case must be remanded. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). While the ALJ need not discuss every piece of evidence in the record, he cannot ignore evidence contrary to his conclusion and must provide reasoning behind the rejection of such evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Herron*, 19 F.3d at 333.

## A. The ALJ Failed to Make a Proper Credibility Finding.

Harris's first contention is that the ALJ failed to make a proper credibility determination. An ALJ must comply with the requirements of Social Security Ruling ("SSR") 96-7p when making a credibility finding. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). A

credibility determination is entitled to substantial deference and will not be disturbed unless patently wrong because the ALJ is in the best position to observe the witnesses. *Dixon*, 270 F.3d at 1177. However, the ALJ cannot simply state that the "individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. The determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brindisi*, 315 F.3d at 787 (citing SSR 96-7p). Where the Commissioner's decision is so poorly articulated as to prevent meaningful review, the case must be remanded. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The ALJ concluded that Harris's "allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision." (R. at 19.) The ALJ stated that he "found the claimant to be a very poor witness, who did not answer direct questions," and that "[t]his conclusion is not inconsistent with the claimant's performance on an MMPI 2 study . . . or his responses on the TAT." (R. at 17.) While a witness that lacks credibility could be considered a poor witness, it does not necessarily follow that a poor witness is not credible. It is not clear if these remarks were intended as support that Harris's testimony was not credible, or simply that Harris was nervous and/or confused during his testimony. Moreover, if these statements were intended as support for finding Harris not credible, it is not clear how the results of the MMPI 2 or TAT test assist in a determination of credibility. Dr. Mouton, who administered the MMPI 2 and TAT tests, noted that the configuration of the scales of the MMPI 2 study was consistent with those observed in both conversion and schizophrenic disorders. (R. at 211.) Dr. Mouton

- 17 -

also noted that the TAT indicated Harris might often feel he is the victim of his environment or that environmental forces conspire against him. (Id.) It is not clear how these potential mental disorders affect Harris's credibility.

The Commissioner advances several arguments as to why the ALJ's finding of credibility should be affirmed. First, the Commissioner contends that the case record supports the ALJ's reasons for finding Harris not credible. (Def.'s Br. at 11.) Specifically, the Commissioner notes that Dr. Mouton remarked that Harris was somewhat "vague" about the specifics of his complaints, that the personality tests revealed possible pathological tendencies, and that Harris himself admitted to problems with concentration and confusion. (Id.) Thus, the Court should infer that the ALJ considered Harris's vagueness, mental health, confusion, and concentration problems relevant to his credibility determination. That may be true. However, ad hoc reasoning is not sufficient or permitted. Our precedent makes clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony; general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ. *Golembiewski*, 322 F.3d at 916. Thus, even where evidence in the case record supports a finding of credibility, the ALJ must still give specific reasons for his finding. SSR 96-7p. Nothing in SSR 96-7p suggests that the reasons for a credibility finding may be implied. *Golembiewski*, 322 F.3d at 916.

Second, the Commissioner also finds support in the ALJ's discussion of objective evidence relating to Harris's ability to walk and stand. (Def.'s Br. at 11.) The Commissioner cites *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) to support the proposition that a

discrepancy between the minimal impairment expected from Harris's conditions and his testimony of debilitating pain casts doubt on credibility. (Id.) Specifically, the Commissioner points out that the ALJ found that Harris had a limited range of motion in his left ankle, which would affect his ability to stand and walk for prolonged periods, but that the records also showed full motor strength in his lower extremities, no neurological deficits, and no impairment in his gait or station. (Id.) However, the ALJ failed to state what the minimal impairment expected is, and how it relates to the medical evidence.

In order to support the determination that a claimant's testimony is not credible, the ALJ must explain how the allegations are inconsistent with the medical findings in the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ's only mention of Harris's testimony was that "[h]e testified that he could stand 10 minutes, walk one block, and carry 25 pounds." (R. at 17.) The ALJ noted that these limitations would not preclude Harris from engaging in various light exertional activities. (Id.) The ALJ found that his conclusions were consistent with the observation of one of Harris's doctors that there may be symptom magnification. (Id.) However, the ALJ found that based on Harris's statements to the doctor, he "*could not meet the standing or walking requirements* of a full range of light work, but he has no limitations on the use of the upper extremities and could lift up to 30 pounds." (Id.) (emphasis added.) The regulations define light work as involving, *inter alia*, "lifting no more than 20 pounds at a time" and requiring a "good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). It is difficult to determine which of Harris's statements or claims the ALJ found not credible. It appears that the ALJ actually gave some credence to Harris's claims of only being

able to "stand 10 minutes, walk one block, and carry 25 pounds," because the ALJ found that Harris could not meet the standing or walking requirements of a full range of light work. (R. at 17.) Therefore, the weight the ALJ gave to the Harris's testimony is unclear, because the ALJ's decision does not specify how the testimony is inconsistent with the medical evidence.

The ALJ's credibility decision is important in this case. Harris testified that he is unable to stand or walk for more than ten minutes and that he experiences lightheadedness most of the day. The vocational expert testified that an inability to work a full day would preclude employment. (R. at 349.) It is difficult to see how someone who has trouble standing or walking and is light-headed most of the day could work a full workday.

If the court is unable to conclude that the ALJ complied with SSR 96-7p, remand is necessary. The Social Security Rulings are binding on the ALJ, as compliance not only allows for a meaningful review, *Brindisi*, 315 F.3d at 787, it allows claimants to feel that they received a full and fair hearing from judicial officers who took their claims seriously. SSR 96-7p ("This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision."). Therefore, since the ALJ's decision regarding Harris's credibility does not articulate specific reasons for his finding of incredibility to allow for meaningful review, the case must be remanded. On remand, the ALJ's decision should specify which statements or claims he finds not credible and how the evidence supports this finding.

## B.    The ALJ Failed to Consider Evidence of a Mental Impairment.

Harris also challenges the ALJ's decision on the ground that he erred by failing to consider evidence of a mental impairment. This Court agrees. It is well settled that an ALJ has a duty to articulate reasons for accepting or rejecting entire lines of evidence. *Golembiewski*, 322 F.3d at 917. While the ALJ need not discuss every piece of evidence in the record, he cannot ignore important evidence or evidence contrary to his conclusion and must provide reasoning behind the rejection of such evidence. *Id.*; *Rohan*, 98 F.3d at 971. Otherwise, it is impossible for a reviewing court to determine whether the ALJ's decision rests upon substantial evidence. *Golembiewski*, 322 F.3d at 917.

In this case, the line of evidence relating to a mental impairment is both important and contrary to the ALJ's rejection of the disability claim and such evidence must be addressed. The Social Security Administration considers mental impairments serious enough to warrant special regulations that outline special techniques to use when evaluating mental impairments and for formulating a mental RFC should the ALJ determine that the claimant has a severe impairment. *See* 20 C.F.R. § 404.1520a. In the case at bar, the ALJ was concerned enough with evidence of a possible mental impairment that he stated during the hearing that he "may get a mental status examination" because of problems raised during the hearing. (R. at 350.) He said that he would like to get a report with a neuropsychological effect before he makes a judgment and left the record open for a month for supplemental evidence. (Id.) However, despite recognizing the importance of a potential mental impairment and holding the record open for evidence, the ALJ completely failed to address the subject in his decision.

The ALJ's initial concerns were warranted because the medical evidence submitted to the ALJ contains ample evidence of a mental impairment. Specifically, in October 2000, Dr. Li questioned whether Harris was suffering from depression and noted that he was considering a neuropsychiatry evaluation. (R. at 177.) Additionally, Harris's treating physician, Dr. Lipson noted that it was difficult to stay with Harris during conversation and that he suspected an aspect of symptom magnification or somaticization. (R. at 210.) Dr. Lipson then consulted with Dr. Mouton, director of the neuropsychology lab at the VA Hospital, who brought up the possibility of conversion hysteria and recommended personality testing. (Id.)

Dr. Mouton administered the personality testing about a week before the hearing. The doctor reported that Harris's self report was odd or unusual, calling into question the possibility of conversion symptoms or delusional material. (R. at 210-11.) She noted that Harris acknowledged experiencing rather "unusual thoughts" and that he indicated that doctors had tried to help him with this. (R. at 211.) Dr. Mouton also reported that Harris acknowledged that he heard voices and that he had been taught by doctors to use various non-medication treating techniques to control this problem. (Id.) The doctor then reported that the results of the MMPI 2 study, although invalid for clinical interpretation, showed a configuration of scales which are consistent with those observed in both conversion and schizophrenic disorders. (Id.) The TAT indicated that Harris might often feel he is the victim of his environment or that environmental forces conspire against him. (Id.) Finally, the doctor noted that Harris's projective sentence completions suggest concerns for his own mental well-being and a tendency toward self isolative behavior. (Id.) Dr. Mouton then concluded that Harris might be suffering from a rather carefully

censored degree of psychotic symptoms, including auditory hallucinations, and recommended him for a psychiatric evaluation. (Id.)

Despite recognizing the possibility of a mental impairment at the hearing and receiving medical evidence supporting its existence, the only acknowledgment of the mental impairment evidence in the ALJ's decision is a reference to the MMPI 2 and TAT tests to support the conclusion that Harris was a poor witness. It is a basic canon of Social Security law that an ALJ must not succumb to the temptation to play doctor and make his or her own independent medical findings. *Rohan*, 98 F.3d at 970. The ALJ apparently considered the evidence of a mental impairment but decided that its only value was to discredit Harris as a witness. The ALJ ignored Dr. Mouton's interpretation of the test results and made his own untrained interpretation, thus, substituting his own opinion for that of a medical professional. Therefore, because the ALJ did not articulate his assessment of the mental impairment evidence, and seemingly made his own medical conclusion, remand is necessary.

Additionally, the ALJ failed to fulfill his obligation to develop the record. The ALJ in a social security hearing has a basic obligation to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Failure to fulfill this duty constitutes good cause for remand for gathering of additional evidence. *Id.* However, this Court will defer to the ALJ's judgment that the record has been adequately developed unless we find a "significant omission" in the evidence. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). An omission is "significant" only if it is prejudicial, *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997), because "one may always obtain another medical examination, seek the views of one more consultant, wait six months to

- 23 -

see whether the claimant's condition changes, and so on." *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993).

In the case at bar, there was a significant omission in the evidence that was prejudicial to Harris. The ALJ allowed for the record to be left open for submission of supplemental evidence for one month. The ALJ received results of a personality test administered by Dr. Mouton, including Dr. Mouton's recommendation that Harris undergo psychiatric evaluation and psychotherapy. However, despite recognizing the potential need for mental impairment testing and receiving the results of a personality test that suggested Harris suffers psychotic symptoms and hallucinations and that he should undergo psychiatric evaluation, the ALJ inexplicably made a determination on disability without even acknowledging the potential mental impairment or developing the record further. At the least, the ALJ's obligation at this point was to wait for the results of the psychiatric evaluation or psychotherapy that Dr. Mouton recommended. The ALJ's failure to address this recommendation and develop the record before making his decision was prejudicial to Harris because a mental impairment can significantly affect his ability to work.

The Commissioner argues that the ALJ's conduct in failing to develop the record further was not prejudicial and therefore remand is not warranted. Specifically, the Commissioner refers to a visit with a psychiatrist in May 2001 where the doctor doubted that Harris's problems had a psychiatric etiology. The Commissioner cites *Nelson v. Apfel* and *Binion v. Shalala* in support of this argument. (Def.'s Br. at 12.) In *Nelson*, the court found that the ALJ conducted a marginal hearing where he abdicated his responsibility to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts" when he failed to ask specific, directed questions of the claimant's mother. *Nelson*, 131 F.3d at 1235-36. The court found that this was not

- 24 -

prejudicial because all of the relevant facts were ultimately introduced and considered by the ALJ. *Id.* Similarly, in *Binion*, the claimant failed to point to any specific facts that were not brought out during the hearing and failed to provide any new medical evidence. *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994). In both of these cases, the court found that, while the hearing may have been lacking in some respects, the ALJ ultimately based his or her decision on a complete record, thus, there was no prejudice to the claimant.

*Nelson* and *Binion* do not apply here because the record was not complete. The ALJ made his decision notwithstanding Dr. Mouton's recommendation that Harris undergo further psychiatric evaluation and psychotherapy. Thus, in the view of the doctor, more evaluation was needed to determine if Harris had a mental impairment. Even if the aforementioned psychiatrist's report calls into doubt a mental impairment, the ALJ was still under an obligation to recognize the evidence that he did have at the time he made his decision and to develop the record further if it was inconclusive. The ALJ should have articulated his assessment of the mental impairment evidence, rather than completely ignore the line of evidence. On remand, the Commissioner should consider the evidence of a mental impairment and, if needed, obtain additional mental impairment evidence and complete a mental assessment and RFC per the regulations.

## C. Additional Considerations upon Remand

Harris raises a number of additional issues. Specifically, Harris alleges that the ALJ made an improper RFC finding and impermissibly ignored relevant medical evidence relating to his tinnitus.

- 25 -

First, Harris contends that the ALJ's finding that Harris could perform the standing and walking requirements of light work was not supported by substantial evidence. He argues that the ALJ did not perform a function-by-function analysis of Harris's ability to perform the requirements of light work, namely the walking and standing requirements. He also contends that the ALJ's report did not build the logical bridge between the evidence and his finding and does not allow for meaningful review.

This Court agrees that the ALJ's analysis was insufficient. As discussed above with regards to the credibility determination, it is not clear from the opinion exactly what evidence the ALJ relied upon to find that Harris could perform "some form of light work," but not the full range. (R. at 17.) The ALJ concluded that Harris was not credible, yet seemed to accept statements made by Harris to the consulting physician and at the hearing. The ALJ also did not specify what the limited range of walking or standing would be, and did not include any such limitations in his "light work" RFC hypothetical posed to the vocational expert. On remand, the ALJ should articulate his reasons for the RFC determination, including specific functional limitations.

Second, Harris argues that the ALJ failed to consider evidence of tinnitus, which is not referred to in the decision. Tinnitus is an impairment that occurs as a symptom of many ear disorders that results in the perception of sound in the absence of an acoustic stimulus. THE MERCK MANUAL 665 (Mark H. Beers, M.D., & Robert Berkow, M.D., eds., 17th ed., Merck Research Laboratories 1999). Tinnitus may be a buzzing, ringing, roaring, whistling, or hissing sound that varies over time and may be accompanied by a hearing loss. *Id.* Evidence of a history of tinnitus is well documented in Harris's record. For example, Harris complained of tinnitus and

various ear problems in January 1999, November 1999, February 2000, and April 2000. (R. at 114, 117, 121, 147.) His complaints ranged from hearing loss and pressure build up to general tinnitus concerns. Dr. Newsom indicated that the tinnitus might be causing problems with concentration. (R. at 219.) While it is not certain that the ALJ failed to consider the evidence of tinnitus completely, as he did place a restriction on Harris limiting him to "simple . . . one to two step tasks . . . which do not require more than low degrees of concentration," (R. at 17), the ALJ did not articulate his reasoning behind this restriction at all. It is not clear if this restriction was intended to accommodate Harris's tinnitus. On remand, the ALJ should clarify how the medical evidence of tinnitus was considered and how it is factored into the RFC, if at all.

### D.     A Sentence Six Remand is Not Warranted.

Finally, Harris contends that new evidence of severe osteoporosis submitted to the Appeals Council also necessitates remand pursuant to sentence six of 42 U.S.C. § 405(g). A sentence six remand is appropriate where there is a showing that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record prior to the proceedings. *Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988). Evidence is new if it is not merely cumulative. *Id.* (citing *Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136 (1st Cir. 1987)). There is good cause for failure to incorporate such evidence if it did not exist at the time of the administrative proceedings. *Id.* The Court of Appeals for the Seventh Circuit has interpreted Section 405(g) to require good cause for a failure to submit new evidence to both the ALJ and the Appeals Council. *Cummings v. Sullivan*, 950 F.2d 492, 500 (7th Cir. 1991). Evidence is material if there is a "reasonable possibility" that its consideration would

- 27 -

have changed the ALJ's decision, *Sears*, 840 F.2d at 400, and the evidence "must 'relate to the claimant's condition during the relevant time period encompassed by the disability application under review.'" *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999) (quoting *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989)).

The parties argue the materiality of the evidence of osteoporosis. In May 2002, Harris was diagnosed with severe osteoporosis in the hip and was advised to take calcium. (R. at 251.) In November and December of 2002 Harris had a consultation exam and follow-up that concurred with the osteoporosis diagnosis. (R. at 248.) The Commissioner argues that the evidence is not material because the osteoporosis was first diagnosed over one year after the ALJ's hearing, thus it was not related to the relevant time period, i.e., before the ALJ's decision. (Def.'s Br. at 14.) Harris counters that osteoporosis is not a disease of sudden onset and that it is indeed relevant to his condition at the time of the hearing because it would affect his ability to stand and walk. (Pl.'s Reply at 10-11.)

This Court agrees with the Commissioner that this case does not require a sentence six remand for consideration of the new evidence of osteoporosis for two reasons. First, the evidence of the osteoporosis was actually submitted to the Appeals Council and was considered by the Council before it denied review. Therefore, the evidence of osteoporosis is not new and "good cause for a failure to submit new evidence" does not exist, because it was submitted and made part of the record. If Harris has developed additional impairments since his first application for benefits, he may file a new application. *See Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990). Second, the evidence of osteoporosis is not material because there is no evidence suggesting that the diagnosed condition was related to Harris's condition during the

- 28 -

relevant time period. The osteoporosis was diagnosed over a year after the ALJ's decision, and Harris has not offered any evidence, besides mere speculation, that indicates that the osteoporosis was or could have been related to his condition during the relevant time period. *See Sears*, 840 F.2d at 404 (noting that the burden is on the claimant to establish a severe impairment).

## IV. Conclusion

For the foregoing reasons, the Court reverses the Commissioner's final decision and remands this case to the ALJ for further proceedings consistent with this opinion. Harris's motion for summary judgment is granted with respect to the sentence four remand request, and the Commissioner's motion for summary judgment on these issues is denied. The Commissioner's motion for summary judgment is granted with respect to the sentence six remand request, and Harris's motion for summary judgment on this issue is denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: April 26, 2005.

Copies have been mailed to:

MARK D. DeBOFSKY, Esq.
Daley, DeBofsky & Bryant
One North LaSalle Street
Suite 3800
Chicago, IL 60602

Attorney for Plaintiff

MS. MALINDA HAMANN
Special Assistant United States Attorney
200 West Adams Street
30th Floor
Chicago, IL 60606

Attorney for Defendant